UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MEGAN ELLIOTT, in her personal capacity, MICHAEL B. SMITH, as personal representative of the Estate of TIM ELLIOTT, deceased,<br><br>                Plaintiffs,<br><br>  v.<br><br>MASON COUNTY, a political subdivision of the State of Washington, et al.,<br><br>                Defendants. | CASE NO. 17-6067 RJB<br><br>ORDER GRANTING DEFENDANT SERGEANT TREVOR SEVERANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

      This matter comes before the Court on Defendant Sergeant Trevor Severance's Renewed Motion for Partial Summary Judgment. Dkt. 38. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

      On December 22, 2017, Plaintiff Megan Elliott filed this case in connection with the shooting death of her father, Tim Elliott, by Defendant Mason County Sheriff's Department Sergeant Trevor Severance. Dkt. 1 and 23. The Amended Complaint asserts federal constitutional claims for violation of Mr. Elliott's Fourth Amendment right against unreasonable

ORDER GRANTING DEFENDANT SERGEANT TREVOR SEVERANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

seizures and for violation of Ms. Elliott's Fourteenth Amendment due process right to the companionship of her parent. Dkt. 23. It also makes state law claims for negligence, gross negligence, battery, negligent use of excessive force, and outrage. *Id.* The Amended Complaint seeks damages, attorneys' fees, and costs. *Id.*

Defendant Severance now renews his motion for summary dismissal of the Fourth Amendment claim only, asserting that he meets both prongs of the test for qualified immunity. Dkt. 38. (His first motion was denied without prejudice, pursuant to Fed. R. Civ. P. 56 (d), in order for Plaintiffs to conduct additional discovery). Plaintiffs oppose the renewed motion. Dkt. 47. For the reasons provided below, the renewed motion to summarily dismiss the Fourth Amendment claim asserted against Defendant Severance (Dkt. 38) should be granted and the claim should be dismissed.

## I.     RELEVANT BACKGROUND FACTS

The following facts are undisputed. On the evening of January 2, 2015, Sergeant Severance responded to a dispatch of a shooting at 691 East Island Lake Drive, Shelton, Washington. Dkt. 30-1, at 2-3. The recording of the dispatch call provides that: the reporting party states "dad just shot himself . . . We're still trying to get information . . . [a]nd it sounds like we're trying to do CPR now." Dkt. 30-1, at 2. The dispatch call did not tell Sergeant Severance that the victim was suicidal or was emotionally disturbed.

In support of his initial motion, Sergeant Severance filed a declaration in which he adopted (with the exception of the addition of a single word) the statements he made during a January 6, 2015 Grays Harbor County Sheriff's Department representative's interview about the incident; he also relies on them in support of his renewed motion. Dkt. 28-1, at 2-3.

In this interview, Sergeant Severance stated that right after he heard the dispatch, he grabbed extra latex gloves and his first aid kit (which was full of equipment to help trauma victims) and headed out. Dkt. 28-1, at 6 and 21. In addition to being a police officer, he was a certified emergency medical technician ("EMT"), and had been for 20 years. Dkt. 28-1, at 6. As he left for the house, he was in the "mind-set of . . . all the scenarios of what we're going to need to do to help Aid help this guy. And the first thing is going to be doing gunshot trauma stuff that [he had] been trained to do." Dkt. 28-1, at 13.

Sergeant Severance, reporting that he was in the area, received an update from the dispatcher, who stated, "Update is the hand is on his, correction, the gun is on his hand. The [reporting party] is unsure exactly what you need done with that." Dkt. 30-1, at 2. Sergeant Severance told the dispatcher to tell the reporting party, who he now knows was Ms. Elliott, "Don't touch anything except for trying to revive [Mr. Elliott]." *Id.* The dispatcher did not tell Sergeant Severance whether the gunshot was a result of an accident or whether it was intentional in this dispatch.

Sergeant Severance states that he pulled up to the house, grabbed his kit, pulled on his latex gloves, and ran up to the front door. Dkt. 28-1, at 6. He knocked and announced himself, then heard a girl scream and so entered the house, moving toward the scream. Dkt. 28-1, at 7. Sergeant Severance headed down a hall, entered a room to his left, and there was another small hall with a wall to his right, "and the room kind of turn[ed] and open[ed] up into a larger room." Dkt. 28-1, at 7. He saw Ms. Elliott at the foot of the bed, and the man he now knows to be Tim Elliott on the bed, laying on his back. *Id.*

Sergeant Severance then describes events as follows:

And I look at her, I look to him to start assessing the scene to make sure it's safe and what I need to do; and I realize that he's actually making eye contact with me,

which was strange because they were supposed to be doing CPR on him. And I look and he's laying on the bed and his shoulders are somewhat propped upon a pillow. And in his right hand, laying on the -- on the bed, was a handgun. It was a revolver.

Dkt. 28-1, at 7. (Sergeant Severance states that when he heard from dispatch that they were performing CPR on the victim, it meant to him, as an EMT, that the victim was non-responsive. Dkt. 28-1, at 22.) He states that Mr. Elliott was alert. Dkt. 48, at 7.

Sergeant Severance asserts that, at that point, he was "scared for everyone's life." Dkt. 48, at 7. He "kind of switch[ed] gears, grabbed [Ms. Elliott], got her out of the room." Dkt. 28-1, at 7. He took Ms. Elliott into the living room, which was around 15-20 feet away. Dkt. 48, at 7. According to Sergeant Severance, Ms. Elliott was hysterical, but followed his command to leave the room. Dkt. 28-1, at 16. He felt that they were out of immediate danger at that point. Dkt. 48, at 8. Sergeant Severance did not attempt to communicate with a supervisor, because he was the supervisor on duty and did not feel that there sufficient time to do so. Dkt. 48, at 9. He thinks that he did try to communicate with dispatch, which other officers in the field would have heard. Dkt. 48, at 9. He did not call a SWAT unit or crisis response unit. *Id.* His plan was to "communicate and make the scene safe so medical aid could be rendered to [Mr. Elliott]." *Id.*, at 10.

Sergeant Severance states that he returned to the room "to ensure the safety of the scene, to include [himself], Mr. Elliott, [and] Megan [Elliott]." Dkt. 50, at 7. He states that he felt that without securing the scene, he could not get Mr. Elliott the emergency medical attention he needed. *Id.* Sergeant Severance got behind a small wall made of drywall, which he believed was a part of a closet. Dkt. 28-1, at 7. He was less than six feet (maybe three feet) from the bed. *Id.* The small wall was the only concealment he had while still being able to see Mr. Elliott. Dkts. 28-1, at 7 and 50, at 8. He states that he did not consider the wall "cover," it only provided

partial "concealment." Dkt. 28-1, at 25. Sergeant Severance was familiar with the type of gun Mr. Elliott had and states that he knew that a bullet from that gun could easily penetrate the wall's drywall and hit anyone behind it. Dkt. 28-1, at 25. Sergeant Severance yelled, "Drop the gun," several times. Dkt. 28-1, at 8. Mr. Elliott was looking at Sergeant Severance, and Sergeant Severance thought Mr. Elliott was "hearing" him. *Id.*

Defendant Mason County Sheriff's Deputy Alfonso Mercado arrived on the scene. Dkt. 28-1, at 73. (Deputy Mercado also filed a declaration in support of the original motion, and in it, he adopts his statements made to Thurston and Lewis County Sheriff's Department representatives in their investigative interview. Dkt. 28-1, at 73-74).

As Deputy Mercado entered the room, Sergeant Severance ordered him to confirm that Ms. Elliott was safely away. Dkt. 28-1, at 8. Deputy Mercado states that he did so and immediately returned, but could not see Mr. Elliott around Sergeant Severance, the closet wall, and some clothes hanging on a rack in the room. Dkt. 28-1, at 79.

At this point, Sergeant Severance states that:

> [Mr. Elliott] brings the gun up from the bed and puts it to the side of his head. And . . . it's a Smith & Wesson .357 or .38. . . . And he's still looking at me. And he says, "Shoot me." . . . [He] can see [Mr. Elliott's] finger on the trigger. And it appears he's either just fingered the trigger or trying to pull the trigger.

Dkt. 28-1, at 8-9. According to Sergeant Severance, "during this process, at least twice, [Mr. Elliott said], 'Just shoot me.'" Dkt. 28-1, at 8. Sergeant Severance kept telling Mr. Elliott to drop the gun, but at that point, he was "scared to death" and "deathly afraid . . . that [he was] not going to make it out of [the] room that night, or [Deputy] Mercado." Dkt. 28-1, at 9. He continues:

> So I'm watching and I'm watching. He's still got his finger there. And then I remember the gun comes off of his temple and starts to come out towards me to the point I just start to see inside the crown. And at that point I decided to shoot

ORDER GRANTING DEFENDANT SERGEANT TREVOR SEVERANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 5

because any more than that I wasn't -- I wasn't going to have enough reaction time to save my own life. And, um, so I fired two shots.

Dkt. 28-1, at 9. Just before Sergeant Severance fired, Deputy Mercado states that Sergeant Severance said, "He is pointing it at me!" Dkt. 28-1, at 79.

After Sergeant Severance fired two shots into Mr. Elliott's side, Deputy Mercado approached Mr. Elliott, checked for a pulse, then began applying pressure to the gunshot wound in Mr. Elliott's abdomen. Dkt. 28-1, at 79. The paramedics arrived and took over, but Mr. Elliott did not survive. Dkt. 23. Less than two minutes passed between the time Sergeant Severance arrived at the house and the time that he fired his gun. Dkts. 28-1, at 14 and 32, at 4.

This case is set to begin trial on March 4, 2019. Dkt. 25.

## PENDING MOTION

In his pending motion for partial summary judgment, Sergeant Severance moves to dismiss the Fourth Amendment excessive force claim only. Dkt. 38. He maintains that he did not violate Mr. Elliott's Fourth Amendment rights, and even if he did, those rights were not clearly established at the time, so he is entitled to qualified immunity. *Id.*

Plaintiffs oppose the motion. Dkt. 47. They maintains that when Sergeant Severance returned to the bedroom (after moving Ms. Elliott to a different room) and confronted Mr. Elliott, whom he knew was alert, fully conscious, armed, and suicidal, Sergeant Severance violated Mr. Elliott's Fourth Amendment rights. *Id.* Plaintiffs assert that Mr. Elliott's rights were clearly established at the time. *Id.*

Sergeant Severance filed a reply, noting that the Plaintiffs did not point to any evidence that he was aware that Mr. Elliott was suicidal. Dkt. 49. He maintains that he did not violate Mr. Elliott's rights, and even if he did, he is entitled to qualified immunity because those rights were not clearly established. *Id.*

**ORGANIZATION OF OPINION**

This opinion will first provide the summary judgment standard, and then consider Sergeant Severance's motion for partial summary judgment on the excessive force claim.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. SECTION 1983 AND QUALIFIED IMMUNITY GENERALLY**

In order to maintain a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

Defendants in a Section 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow,* at 815. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d

868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, a court must determine: (1) whether a constitutional right has been violated considering the facts in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). A court has discretion to consider the second *Saucier* factor first, "whether the right was clearly established." *Pearson,* at 236. The plaintiff bears the burden of proving that the particular federal right was violated and was clearly established at the time. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

**C. VIOLATION**

The Fourth Amendment to the United States Constitution protects people against "unreasonable searches and seizures." "[D]etermining whether the use of force to effect a seizure was unreasonable under the Fourth Amendment—and therefore unlawful—requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946–47 (9th Cir. 2017)(*internal citations omitted*).

Here, the intrusion on Mr. Elliott's rights was severe, no further analysis on this factor is required. *See generally*, *Isayeva,* at 947.

In evaluating the governmental interest, factors generally considered include: (1) "the severity of the suspect's alleged crime;" (2) "whether the suspect posed an immediate threat to the officers' safety;" and (3) "whether the suspect was actively resisting arrest or attempting to escape." *Isayeva,* at 947; *Graham v. Conner*, 490 U.S. 386, 396 (1990). "These factors are non-exhaustive." *Estate of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir.

2017)(*cert. denied sub nom. Gelhaus v. Estate of Lopez ex rel. Lopez*, 138 S. Ct. 2680 (2018)). Other factors include: (4) "the availability of less intrusive alternatives to the force employed," (5) "whether proper warnings were given," and (6) "whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Isayeva,* at 947 (*internal citations omitted*). "Courts still must examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*" or other cases. *Estate of Lopez,* at 1006. To that end, the Plaintiffs urge the Court to additionally consider (7) whether Sergeant Severance's decision to return to the room unreasonably provoked Mr. Elliott, creating a situation where the use of force became necessary under the totality of the circumstances.

Construing the facts in the Plaintiffs' favor, at the time of the shooting, Sergeant Severance returned to a room where he knew that Mr. Elliott had been shot, but was conscious and armed. (Plaintiffs' assertion that Sergeant Severance knew Mr. Elliott was suicidal is not supported by the record – he knew that Mr. Elliott had a self-inflicted gunshot, not that he was suicidal until Mr. Elliott lifted the gun off the bed to his own head and said, "just shoot me.") Sergeant Severance did not know how badly Mr. Elliott was injured, because Sergeant Severance felt he needed to make the scene safe in order to medically assess Mr. Elliott. Sergeant Severance did not ask Ms. Elliott about her father's condition; he states that Ms. Elliott was hysterical. Plaintiff offers no evidence that anyone told Sergeant Severance that Mr. Elliott was suicidal or emotionally disturbed; only that Mr. Elliott had a self-inflicted gunshot wound. Sergeant Severance did not call in a SWAT unit or a crisis response unit, or wait for others to arrive before he tried to determine whether Mr. Elliott needed immediate emergency medical care. Just before the shooting, Sergeant Severance states that Mr. Elliott lifted the gun off the bed and to his head;

Sergeant Severance repeatedly yelled "drop the gun." Then, according to Sergeant Severance, Mr. Elliott said, "just shoot me." Mr. Elliott then moved the gun barrel away from his own head and swung it toward Sergeant Severance and Deputy Mercado, who was next to Sergeant Severance behind the little wall made of drywall. Once Mr. Elliott moved the gun toward Sergeant Severance (and Deputy Mercado), to the point that Sergeant Severance could see the crown of the gun (the beginning of the opening of barrel of the gun), Sergeant Severance fired.

### 1. Severity of the Alleged Crime

As to the *Graham* factors, at the time that Sergeant Severance shot Mr. Elliott, the severity of Mr. Elliott's alleged crime was significant: he was in the process of pointing his gun at the officers – at a minimum, threatening to assault them with a deadly weapon. Prior to that action, Mr. Elliott had not committed a crime.

### 2. Immediate Threat to Safety

Mr. Elliott posed an immediate threat to the officers' safety – he was in the process of pointing a loaded gun at them after saying, "just shoot me." "Of all these considerations, the most important is whether the suspect posed an immediate threat to the safety of the officers or others." *Isayeva,* at 947 (*internal quotation marks and citations omitted*). When, as here, "an officer uses deadly force, this factor becomes a strict requirement: the officer must have probable cause to believe that the suspect poses a significant threat of death or serious physical injury." *Id.* The officers here had probable cause to believe that Mr. Elliott posed a "significant threat of death or serious physical injury" to them when he swung the gun toward them, particularly when Sergeant Severance could begin to see down the opening of the barrel of the gun.

ORDER GRANTING DEFENDANT SERGEANT TREVOR SEVERANCE'S MOTION FOR PARTIAL SUMMARY JUDGMENT - 11

### 3. Actively Resisting Arrest or Attempting to Escape

While Mr. Elliott was not actively resisting arrest or attempting to escape, he was acting threateningly and not cooperating.

### 4. Less Intrusive Alternative to the Force Employed

As to the other relevant factors, at the time of the shooting, once Sergeant Severance could see the beginning of the barrel of the gun, no other "less intrusive alternatives to the force employed" were available. Doing nothing would not be reasonable. Not only was Sergeant Severance reasonably concerned for his own safety, but, based on his knowledge of Mr. Elliott's firearm, he knew that Deputy Mercado was also in danger because the bullets could easily go through the drywall of the wall Deputy Mercado was behind.

### 5. Proper Warnings

Further, the record indicates that "proper warnings were given" – Sergeant Severance yelled at Mr. Elliott several times to drop his gun. As soon as he realized that Mr. Elliott was moving the gun away from his own head and beginning to point his gun at them, there is no evidence that there was time to give any other warnings. While the Plaintiffs argue that Mr. Elliott may not have heard the warnings because he was "intoxicated and incoherent," she points to no evidence that Sergeant Severance knew that Mr. Elliott was intoxicated. Moreover, Sergeant Severance maintains that Mr. Elliott said "just shoot me." Ms. Elliott stated, before the officers arrived, her father told her "I'm not going to make it," or something to that effect, though he was hard to understand. Dkt. 28-1, at 37. Mr. Elliott was, at least, somewhat coherent.

### 6. Apparent that Mr. Elliott was Emotionally Disturbed

The Plaintiffs repeatedly argue that it should have been apparent to Sergeant Severance that Mr. Elliott was emotionally disturbed. Sergeant Severance states that he knew that he was

responding to a self-inflicted gunshot. There was no other evidence that Mr. Elliott was suicidal or emotionally disturbed. Sergeant Severance did not know how badly injured Mr. Elliott was, or whether his demeanor was a result of being shot, or otherwise. When Sergeant Severance initially entered the room, the gun was in Mr. Elliott's hand, but his hand was on the bed. It wasn't until the second time Sergeant Severance entered the room that Mr. Elliott lifted the gun to his head and said, "just shoot me." It was at that point that there is evidence from which Sergeant Severance could have concluded that Mr. Elliott was suicidal or emotionally disturbed.

### 7. Provocation and the Totality of the Circumstances

The Plaintiffs assert that Sergeant Severance provoked the situation by confronting Mr. Elliott after returning to the room where Sergeant Severance knew that Mr. Elliott was armed and alert. She points to expert testimony which states that Sergeant Severance should have gathered more information, waited for others to arrive, called a crisis response unit, etc. before he reentered the room, in arguing that his decision to return was unreasonable. Dkt. 47. She points to several cases where officers were denied qualified immunity when the officers provoked a situation which forced them to use deadly force. Dkt. 47.

Plaintiffs fail to take into account that this case contains an additional consideration, which is fact-specific to it: Sergeant Severance knew that Mr. Elliott was injured from a gunshot wound and needed medical attention. His decision to return to the room to ascertain if it was safe enough to assess whether Mr. Elliott needed immediate medical attention - potentially life-saving attention - should also be considered. None of the cases Plaintiffs cited included a situation where the officers were concerned that the victim was already injured to an unknown extent by a gunshot.

On balance, the use of force here was reasonable – while the "nature and quality of the intrusion" on Mr. Elliott's Fourth Amendment interests was significant, considering the totality of the circumstances, the countervailing governmental interests at stake outweighed his individual interests. *Isayeva,* at 946-47.

Even if Sergeant Severance violated Mr. Elliott's Fourth Amendment rights when he returned to the room, under the circumstances presented here, those rights were not clearly established at the time.

### D. CLEARLY ESTABLISHED RIGHT

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Although the Supreme "Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*internal quotation marks and citation omitted*).

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, at 1153 (*internal quotation marks and citation omitted*). The shooting took place on the night of January 2, 2015. The issue is whether precedent as of January 2, 2015 – the night of the shooting – put Sergeant Severance "on clear notice that using deadly force in these particular circumstances would be excessive." *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017).

Plaintiffs fail to carry their burden to point to precedent in existence at the time that would have put Sergeant Severance on notice that using deadly force in these particular circumstances would be excessive. The Plaintiff points to *McGregor v. Kitsap County*, 2018 WL 2317651 (W.D. Wash. 2018) and *Maddox v. City of Sandpoint,* 2017 WL 4343031 (D. Idaho 2017). Dkt. 47. Neither of these cases is "clearly establish law for purposes of qualified immunity" because they are district court cases and were decided after the January 2015 shooting here. *S.B.*, at 1015-1016. Further, they are factually distinct from the case at hand. While they both involved suicidal individuals, neither victim was injured before the police arrived or had a gun.

Plaintiffs also point to *Crawley v. Kings County,* 2014 WL 2174848, at *6 (E.D. Cal 2014) and *Nelson v. City of Los Angeles*, 2014 WL 6066053, at *12 (C.D. Cal. Nov. 13, 2014) for the proposition that it was clearly established that officers who intentionally or recklessly provoke a violent response are liable for the use of excessive force. Neither of these cases is sufficient to clearly establish relative law of which a reasonable officer would have known. First, they are district court cases, and so are inadequate to put Sergeant Severance on notice. *S.B.*, at 1015-1016. Second, in each of these cases, the courts relied on a theory of liability called the "provocation rule." The provocation rule provided that a law officer could be held liable for an otherwise reasonable use of force when the officer commits a separate Fourth Amendment violation – improper entry into a home for example. *County of Los Angeles v. Mendez,* 137 S. Ct. 1539 (2017). This theory of liability was expressly overruled by the U.S. Supreme Court in *County of Los Angeles v. Mendez,* 137 S. Ct. 1539 (2017). While the U.S. Supreme Court did not rule on whether, under the "totality of the circumstances" assessment, an officer's unreasonable conduct prior to the use of force which foreseeably created the need to use force

could be considered, that was not the basis for the holdings in the two district court cases cited by the Plaintiffs. They used the "provocation rule," which was expressly overruled. Further, neither of these cases involved people who were suffering an injury before the police arrived or had a gun they pointed at the police.

Plaintiffs cite another district court case, *Stewart v. City of Prairie Village,* 904 F. Supp. 2d 1143, 1158 (D. Kan. 2012) which relied on an officer's allegedly unreasonable conduct before the use of force became necessary to deny a motion to dismiss under the "totality of the circumstances" assessment. Dkt. 47. They argue that this case provided a clear warning to Defendant Severance. *Id.* This case, also, is a district court case and, so, is not adequate notice, *S.B.*, at 1015-1016, and is factually distinct.

Further, the Plaintiffs cite to an unpublished Tenth Circuit case, *Hastings v. Barnes,* 252 F. App'x 197 (10th Cir. 2007), where officers were denied qualified immunity based on a "totality of the circumstances" assessment because the officers' actions before the use of deadly force foreseeably caused the need to use force with a mentally ill and suicidal man. In *Hastings,* the victim, Mr. Hastings, called social services for help, stating that he was suicidal, and planned on killing himself by placing a hose in his truck and inhaling the gas. *Hastings,* at 199. Social services called 911 and officers went out Mr. Hastings home. *Id.* Mr. Hastings opened the door and the officers asked him to come out on the porch. *Id.* Mr. Hastings indicated that he wanted to get his shoes and turned and ran to a back bedroom. *Id.* The officers raced into the house behind him; when they got there, Mr. Hastings had armed himself with a sword and was in a defensive position, but was not acting aggressively. *Id.*, at 199-200. The officers repeatedly told him to put down his sword. *Id.* He lowered the sword and picked up the phone. *Id.* While he was on the phone, one of the officers pepper sprayed Mr. Hastings to try to get him to drop the

1  sword.  *Id.*  The pepper spray did not have much effect, and Mr. Hastings lifted the sword and

2  came toward the officers.  *Id.*  They opened fire and killed him.  *Id.*

3        *Hastings* and all the other cases cited by the Plaintiffs are distinguishable because none of

4  the victims there were badly injured, in need of medical attention, and the Defendants were made

5  aware of the victim's emotional states.  Mr. Hastings, for example, was not injured, and so the

6  officers' decision to follow him through the house to the back bedroom was markedly different

7  than the case here.  The officers there were not concerned that Mr. Hastings was already injured

8  and in need of medical attention and knew he was suicidal.  In contrast, Sergeant Severance

9  knew that Mr. Elliott was suffering from a gunshot wound, and was very concerned that Mr.

10  Elliott needed immediate medical attention.  It wasn't until Sergeant Severance returned to the

11  room the second time that Mr. Elliott lifted the gun off the bed, placed it to his own head, and

12  made the statement "just shoot me," that Sergeant Severance became aware that Mr. Elliott was

13  suicidal or otherwise was emotionally disturbed.  Further, none of the cases cited by the

14  Plaintiffs involved someone who pointed a gun at the officers or someone who was even armed

15  with a gun; in each of Plaintiff's cases, the victims were either unarmed, or armed with a knife,

16  sword, bat, or golf club, etc.  None of the cases cited by the Plaintiffs provide Sergeant

17  Severance "notice that that using deadly force in these particular circumstances would be

18  excessive."  *S.B.,* at 1015.  Sergeant Severance is entitled to qualified immunity.

19      Accordingly, Sergeant Severance's renewed motion for partial summary judgment (Dkt. 38)

20  should be granted.

## III. ORDER

Therefore, it is hereby **ORDERED** that:

- Defendant Sergeant Trevor Severance's Renewed Motion for Partial Summary Judgment (Dkt. 38) **IS GRANTED**; and

- The claim for violation of Mr. Elliott's Fourth Amendment right, asserted against Sergeant Trevor Severance, **IS DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 28th day of November, 2018.

*[signature]*

ROBERT J. BRYAN
United States District Judge